No. 13,638.

E. D. MOORE vs. W. R. PICKERING LUMBER CO.

. SYLLABUS.

1. Where an employee in a saw mill, whilst on his way to discharge a duty which he has been ordered to perform, in passing along one of the open, public thoroughfares of the mill, stops to exchange a remark with a fellow employee concerning the operation of the machinery of the mill, and is struck and injured by a belt which breaks at the moment, he will not be held guilty of such contributory negligence as will preclude his recovery of damages because he happened to stop in front of (though eight feet away from) the pulley which carried the offending belt. If the place was too unsafe to be used for such a purpose it ought not to have been kept open as a common passage or thoroughfare.

2. Nor is it a sufficient defense to say that he was not, when injured, engaged in the discharge of any work for the mill, but was merely idling, since it was not inconsistent with the proper discharge of the duty to which he was assigned that he should have exchanged a few words with a fellow employee concerning a matter of common interest to them and to their employer.

3. Verdict and judgment for $10,000 reduced to $3,500.

A PPEAL from the Twelfth Judicial District, Parish of Vernon— Lee, J.

*Egan* & *Pegues* for Plaintiff, Appellee.

*Pujo* & *Moss*, for Defendant, Appellant.

The opinion of the court was delivered by

MONROE, J. This is an action in damages for personal injuries which the plaintiff claims to have sustained whilst in the employ of the defendant, and by reason of defendant's negligence.

The defence is that whatever injuries may have befallen the plaintiff were the results of his own negligence, in that "he left his post of duty and exposed himself in a dangerous and hazardous position," etc.; and, "in the alternative", that, if plaintiff was injured in the manner set forth, the proximate cause of such injury was the omission of a fellow servant properly to discharge his duty, and that the plaintiff had assumed the risk of such omission and is therefore not entitled to recover.

The evidence, in which there is no serious conflict, establishes the following facts, to-wit:

The defendant company, during the year 1901, and prior thereto, was operating a saw mill in the parish of Vernon, for the purposes of which it employed about 150 men.

On or before the 1st of March, 1900, the mill was "shut down" for repairs and for the putting in of a new engine, and the plaintiff was, at that time, employed in the capacity of mill-wright and general helper.

It does not appear that his employment was limited to the particular work which was then undertaken, or that there was any understanding to the effect that it should terminate when that work was completed. On the contrary, he seems to have been employed as a general utility man, whose services might have been needed in such an establishment the year round. At all events, work having been resumed on the morning of March 19th, he was still in the employ of the defendant.

The evidence shows that the adjustment of certain "line shafting" was not altogether true, that one of its bearings had a tendency to become heated; and that the plaintiff who though not continuously occupied at any one thing, had been engaged in various jobs during the day, was instructed by the foreman to watch said bearing, and, in the event

of its becoming heated, to take such steps as were necessary in the premises, the idea being that he was either to oil the bearing, or call the attention of the man employed as oiler to it. Acting in accordance with these specific instructions, the plaintiff, between three and four o'clock in the afternoon, was going to inspect the bearing, or "box" in question, when he met one Hinson, another employe of defendants, and stopped for a moment to exchange a remark about a "hot box" in another part of the mill.

The shaft which has been mentioned was in position five feet above the level of the floor, supported by two horizontal beams, six feet apart, the points of contact between the shaft and the beams being the bearings where the heating was feared. Midway between these two beams, a driving pulley, four feet in diameter, and carrying a belt sixteen inches wide and forty feet long, was attached to the shaft.

The place at which plaintiff stopped was in a thoroughfare, at a point about eight feet from this pulley and equidistant between it and a stairway leading into the engine room. And whilst he was thus stopped, the belt, which the pulley was carrying with great velocity, parted, and flying into space, struck him with such force as to lift him from the floor and to break both of his legs. It appears that the oiler, for his convenience, in order to get from the bearing on one of the beams mentioned to the bearing on the other, had laid a plank across the two beams, at a distance of about three feet from the pulley, and between the pulley and the place where plaintiff received his injury, and it is, no doubt, a fact that the plaintiff might have crossed in front of the pulley on this plank, instead of passing along a thoroughfare some five feet away; or, he might have made a circuit which would have obviated the necessity of passing in front of the pulley at all. There is nothing to show, however, that he knew, or had any reason to suspect, that the belt which inflicted the injury was defective, or that the thoroughfare through which he had undertaken to pass was dangerous and should have been avoided. Upon the other hand, it is shown that Striker, the foreman, some time after November 1st, 1899, notified Mace, the superintendent, that "he had better order a new belt, as the one in use was liable to give out—the laps were beginning to show loosening, and better have another to take its place." It appears from Striker's testimony that he knew enough about the belt from personal observation to justify his giving this notice, though he also testifies that he never really examined it, and that his idea in providing a

new one was to avoid delay in case it gave out. He also testifies that before resuming operations, on March 19th, he had some conversation with Boatman, a man whose special duty it was to look after the belts, from which he concluded that the belt in use was still safe, and hence that it was not then necessary to substitute the new rubber belt, which several months before had been ordered and received at the mill. Mr. Striker, however, distinctly disclaims having examined the belt at any time, and although he intimates that there might have been some doubt upon the subject of the extent of his authority over Boatman, with respect to belts, we understand him, upon the whole, to mean, that if he had directed that the new belt should be put on, his orders would have been obeyed.

Boatman testifies that he was the "belt man" for the mill and his examination proceeds as follows, to-wit:

"Q.—You say you had inspected that (belt) previous to the accident? A.—Yes, sir; I had. Q.—Did you find anything wrong about that belt? A.—In a practical way, yes, sir. Q.—What was the matter with the belt? A.—It was sixteen inch, double leather—in making the belts "nowadays, they make four and a half inch joints, or laps; this lap, "you understand, makes the lap of the belt break joints. Q.—Was "there anything wrong with those laps? A.—It needed mending; I "spoke to Mr. Striker, asked him; suggested that he get some leather "that I would repair the belt, that by a little work it would run, prob- "ably two years. Q.—What was the matter with the belt, Mr. Boat- "man? A.—That the joint where it was cemented had become unce- "mented about two and a half inches back. Q.—Did you do anything "for the belt? A.—I put some rivets in it. Q.—Did you or did you "not condemn that belt? A.—Well, when I go over a belt to work on "it, I take it off the pulley, for I cannot work them on the pulley. "When they are tight enough to work without a tightener, it is too "tight to work, and when it has a tightener on it, it is too tight to work "on, particularly when it is a round tooth shaft, or pulley; you have "to take it off and put it on a bench or on the floor. Q.—Did you, or "did you not, condemn that belt? (Objected to and the objection over- "ruled.) A.—In a practical way, it was liable to have a shut down; "might have been a month or two months, or not but a day or two. "Q.—Did you or did you not condemn that belt? A.—The word 'con- "demned' was not used when I was talking to Mr. Striker. I told him "it was not practical to use it without doing some repairing; he sug-

" gested it might run, and I told him it might run a month or two or " only a day or two."

This witness testifies that persons who are in the neighborhood of a belt that breaks or jumps from a pulley are liable to be injured.' Considering the testimony thus recited, in connection with that of the foreman, Striker, we conclude that, whilst the latter abstained from making, or neglected to make, a critical examination of the belt in question, he was sufficiently informed of its condition to know that it was likely to break at any moment; and that he continued said belt in use, notwithstanding this information, and notwithstanding the fact that he knew, or ought to have known, that its breaking would be attended with danger to anyone who might be in the neighborhood at the time.

Upon the subject of the extent of the plaintiff's injuries, it is shown that both bones of the left leg were broken about three and a half inches above the ankle, and were also broken at a point about four inches higher up, and that the fractures were comminuted, that is to say, the bones were crushed. It also appears that the left ankle was badly sprained, and that there was a simple fracture of the large bone of the right leg, below the knee. At the date of trial, nearly four months after the accident, the plaintiff was barely getting around on crutches, the left ankle being stiff and considerably swollen, and the leg showing a great deal of "callous" which had not been absorbed, and which will never be entirely absorbed. Several physicians were examined, and the concensus of opinion was, that the plaintiff must have suffered a great deal; that the injury received by him will have the effect of permanently weakening his left leg; and that his right leg will recover its strength and be practically as good as before. We gather from this testimony that it was not considered likely that he would be able to do any physical work within ten months from the date of the accident. It is shown that he was thirty years of age and was earning $2.25 per day.

A good deal of attention was devoted during the trial in the lower court to the plank which the oiler had placed across in front of the line shaft in order to facilitate him in going from the bearing, or "box", on one beam to that on the other, the idea being, apparently, that the plaintiff was guilty of negligence in not having sought to reach the bearing, which he started to inspect, by means of said plank rather than by the route which he was pursuing when injured. But, as this theory is not referred to in the brief, and finds no support in the facts

disclosed, we assume that it is not insisted on. The defendant's counsel, with equally good reason, appear to have abandoned that portion of the defence which was predicated upon the theory that the injury to plaintiff was caused by the negligence of a fellow servant, it being clearly established that the foreman of the mill knew, or ought to have known, that the belt which inflicted the injury was in such a condition that it was likely to break at any time, and that, in the event of its breaking, there would be danger to those who might be nearby.

The positions upon which the defendant relies are, therefore, *first*: that plaintiff, when injured, was not engaged in the discharge of any duty, but was merely idling about the mill, and drawing wages, although improperly carried on defendant's pay-roll; and *second*, that the amount awarded is excessive.

The first of these positions is hardly authorized by, or consistent with, the defence, as set up in the answer, which distinctly recognizes plaintiff's *status* as an employee. It is, moreover, unsupported by the evidence, which shows that palintiff was originally employed as millwright and general helper; that he was expected to do anything that he was ordered to do; and that, upon the day of the accident, he had been engaged on various jobs and, when injured, was acting under specific instructions to inspect a bearing of the line shaft, and was on his way to discharge that duty, when, meeting another employee, he stopped to exchange a remark concerning a "hot box," or bearing, in another part of the mill, and at that moment met with the accident.

It is said that this was idling, and that plaintiff was guilty of negligence in stopping in a dangerous place, *i. e.*, in front of the pulley which carried the belt by which he was injured. We are unable to concur in this view. The mill had been started in operation that day, and there were "hot boxes," apparently, in several directions. At the moment when plaintiff was injured, the oilers who testified in the case were engaged in pouring water on one or more of them in order to cool them off, and to hold that plaintiff was guilty of idling, merely because he stopped long enough, whilst on his way to inspect another box, to inform Hinson that there was a "hot box" in the back part of the mill, would be unreasonable. And, equally unreasonable would it be, to hold that he was guilty of contributory negligence in stopping where he did. We attach to this opinion a diagram taken from the brief of defendant's counsel and which is a copy of an original made at defendant's instance, save as to the plank which has been mentioned,

and which escaped the attention of the engineer by whom the original was made, but which appears in the copy and is marked "*R. Board.*" We have also indicated upon this copy the direction from which the plaintiff had come, and the particular "bearing" that he was on his way to inspect. From this it will be seen that he had taken the most natural and direct route to reach his destination, and that, when injured, he was in a passage, or thoroughfare, intended for general use, and only about ten feet in front of the stairway leading to the engine room. Under these circumstances, he cannot be held to have been guilty of contributory negligence with respect to the accident which happened because he stopped for a moment in such a place to make a remark to a fellow employe concerning the operation of the mill in which they were both engaged. If the place at which they stopped was considered safe enough to be used as a thoroughfare, the employees of the mill had a right to presume that it was safe enough to justify such use of it as is commonly made of thoroughfares. And if it was so unsafe that anyone stopping there for a moment should be held guilty of negligence, it ought to have been closed entirely by the owners of the mill, and not kept open for the general use of all who had occasion to pass that way, and who might stop to exchange casual remarks, or to speak with each other concerning the business in which they were engaged.

Upon the question of amount, we are of opinion that $10,000 is excessive. The age of the defendant, his earning capacity, and the character and probable effect of his injury have been stated, and these elements, together with the jurisprudence of this court in cases of similar character, being considered, we conclude that the amount allowed should be reduced to $3500.00. See Dickson vs. Pittsburg & Gulf Lumber Co., 52 Ann. 1109, and authorities there cited.

It is, therefore, ordered, adjudged and decreed that the judgment appealed from be amended by reducing the amount allowed therein from ten thousand dollars to three thousand five hundred dollars, and, as thus amended, that said judgment be affirmed; the appellee to pay the costs of the appeal.

SECTION OF MILL AT PICKERING, LA.

SCALE 1—4" TO 1 FOOT